IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIEL JOSEPH PREZIOSI,    )
    )
    Plaintiff,    )
    )    2:19-cv-1437
    v.    )
    )    Magistrate Judge Patricia L. Dodge
    )
WILLIAM NICHOLSON, STEPHANIE    )
WOOD, MARY ELLEN TORMEY, and    )
MARK HAMMER,    )
    )
    Defendants.    )

## MEMORANDUM OPINION[1]

Pending before the Court are Defendants' motions for summary judgment (ECF 110, 113) and Plaintiff's partial cross-motion for summary judgment (ECF 120). For the reasons that follow, Defendants' motions will be granted and Plaintiff's motion will be denied.

### I.  Relevant Procedural Background

Plaintiff Daniel Joseph Preziosi is a state prisoner in the custody of the Pennsylvania Department of Corrections ("DOC"). He is proceeding *pro se* in this civil rights action, which he brings under 42 U.S.C. § 1983.

Plaintiff is currently incarcerated at the State Correctional Institution ("SCI") at Mahanoy. The events at issue in this lawsuit occurred between May 2017 and September 2019 while he was housed at SCI Greene. At all relevant times, either Stephanie Wood or William Nicholson ("DOC Defendants") was a Chief Health Care Administrator ("CHCA") at SCI Greene. Mary Ellen

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

Tormey, CRNP, and Mark Hammer PA-C ("Medical Defendants"), were medical providers at SCI Greene.[2]

Plaintiff brought this civil rights action on or around October 29, 2019, the date he submitted his original complaint (ECF 7) to prison authorities for mailing. The original complaint (ECF 7) named as defendants the DOC and the Medical Defendants and raised the above-cited claims. (*Id.* ¶¶ 98-105.) Plaintiff alleged in the original complaint he had fully exhausted all claims against all defendants. (*Id.* ¶¶ 5, 77.) As discussed below, that allegation was not accurate as it pertained to the claims brought against Defendant Hammer.

Plaintiff filed his First Amended Complaint in February 2020. (ECF 17.) On March 20, 2020, he filed a motion (ECF 26) seeking leave to file a second amended complaint in order to add Correct Care Solutions ("CCS") as a defendant. He also sought leave to further amend his complaint "because he recently received his medical records and [now] has sufficient dates and facts to make investigation and answering by defendants easier." (*Id.*) The Court granted Plaintiff's motion and the Second Amended Complaint was filed. (ECF 25).

The Second Amended Complaint asserts the same claims against the DOC Defendants and the Medical Defendants that were pleaded in the original complaint.  In the Second Amended Complaint, the operative pleading, Plaintiff asserted the following claims against these defendants:

1. Defendant Nicholson violated his Eighth Amendment rights because:

   (a) between September 18, 2017 through April 10, 2018 he failed to ensure that Plaintiff received physical therapy and a follow-up visit, as ordered by Dr. Smyth and Dr. Jayakumar as part of their treatment plans for his chronic neck pain. (Amend. Compl.

---

[2] Numerous providers were involved in Plaintiff's medical treatment and care when he was at SCI Greene. In this lawsuit he complains only about the medical care provided to him by Defendant Tormey during four sick call visits with him between May 18, 2018 and August 1, 2018, and by Defendant Hammer in September 2019.

¶¶ 11-27, 98, 104-05; ECF 121 pp. 10-13); and

(b) he obstructed and interfered with Plaintiff's need for emergency medical treatment for severe neck pain on January 3, 2019. (*Id.* ¶¶ 60-70, 98, 104-05; ECF 121 pp. 13-16.)

2.   Defendant Tormey, who conducted four sick call visits with Plaintiff between May 18, 2018 and August 1, 2018, violated his Eighth Amendment rights because she denied him care for the pain he was experiencing from his chronic neck issues as well as ear and vertigo issues. (*Id.* ¶¶ 30-46, 100; ECF 121 pp. 20-23.)

3.   Defendants Wood and Nicholson violated his Eighth Amendment rights because they did not ensure that Plaintiff received appropriate care after they were separately notified in August 2018 that Defendant Tormey was not providing him with treatment for his neck pain and other painful symptoms. (*Id.* ¶¶ 46-47, 98-99, 104-05; ECF 121 pp. 13-16, 18-19; ECF 131 ¶¶ 39-43.)

4.   Defendant Wood violated his Eighth Amendment rights because she delayed his medical care after he "irritated his neck injury and [his] pain flared up" again on August 28, 2018, and was advised he needed to see a doctor and his sick call slips were not being answered due to a prison lockdown. (*Id.* ¶¶ 48-55, 98-99, 104-05; ECF 121 pp. 16-18, 19-20.)

5.   Defendant Hammer:

(a) violated his Eighth Amendment rights for discontinuing Prozac and Neurontin and instead prescribing Cymbalta following a sick call visit he conducted on September 17, 2019 at Plaintiff's cell door, causing Plaintiff to experience severe withdrawal symptoms. (*Id.* ¶¶ 72-82, 101-02; ECF 121 pp. 23-28.);

(b) violated his Eighth and Fourteenth Amendment rights for not providing Plaintiff with information to make an informed decision as to the medication change to Cymbalta on September 17, 2019, and because he "had prior medical documentation and Plaintiff informed him that [Cymbalta] caused adverse effects, thus supporting his deliberate indifference to informed consent[.]" (*Id.* ¶ 102; ECF 121 pp. 28-32.); and

(c) violated his Fourteenth Amendment right to privacy by conducting sick call visits in September 2019 at Plaintiff's cell door within hearing distance of other individuals. (*Id.* ¶¶ 72, 103.)

Plaintiff seeks an award of compensatory, punitive and nominal damages, as well as declaratory relief. (*Id.* ¶¶ 106-09.)

Plaintiff subsequently voluntarily dismissed all claims against CCS and CCS was

dismissed as a defendant from this lawsuit. (ECF 40, 41.) The Medical and DOC Defendants answered the Second Amended Complaint. (ECF 37, 44.)

After discovery in this case concluded, the Defendants filed their respective motions for summary judgment and supporting documents. (Medical Defendants, ECF 110, 118-19, 138; DOC Defendants, ECF 113-16, 137, 140.) Plaintiff filed responses in opposition to these motions. (ECF 129, 130-31.) He also filed a partial cross-motion for summary judgment and supporting documents (ECF 120-22, 139, 145), to which Defendants filed responses in opposition (ECF 125, 141-42). All pending motions are fully briefed.

As discussed below, Defendants have met their burden of establishing that, when viewing the facts in the light most favorable to Plaintiff, their dispositive motions should be granted in their entirety. This obviates the need to specifically address the arguments Plaintiff makes in his partial cross-motion for summary judgment and necessarily requires that his motion be denied. The Court has carefully considered all of Plaintiff's submissions in its analysis, however, including his brief in support of his partial cross-motion for summary judgment (ECF 121), his concise statement of undisputed facts (ECF 122) and supporting exhibits (ECF 121-1 to 121-32), as well as his replies (ECF 139, 145) to Defendants' responses to his motion.

## II.    Relevant Factual Background[3]

### The DOC Defendants' Duties as CHCAs

The DOC confined Plaintiff at SCI Greene from June 25, 2015 to November 7, 2019. The DOC Defendants, both of whom served as a CHCA at SCI Greene, did not act as health care providers or clinicians. (ECF 115 ¶¶ 2-4.) The DOC's health care policies define the role of the CHCA as the "[t]he on-site administrator responsible for monitoring on-site contractual compliance and/or directing the daily operations of the Medical Department at the facility and providing supervision and direction to Department medical personnel." (ECF 121-10 p. 2.) A CHCA is an administrative position, and in their roles as CHCAs the DOC Defendants were responsible for overseeing delivery of health care services at SCI Greene. (ECF 121-10 pp. 3-4.)

DOC policy provides that a CHCA is responsible to ensure that an inmate receives ordered or referred follow-up visits after an initial sick call. The CHCA also is responsible to ensure that on-site consultations are conducted within 30 days. (ECF 122 ¶¶ 16; ECF 142 ¶¶ 15-16; ECF 121-11 pp. 3-4.) Plaintiff asserts that it is a routine and established practice at SCI Greene that medical personnel or physicians wait until physical therapy is complete before moving to further testing and specialist consults. (ECF 122 ¶ 17; ECF 121-8 p. 5.) The DOC Defendants do not dispute this

---

[3]  The factual background discussed here is only that which is relevant to the disposition of the arguments raised in the parties' motions for summary judgment. It is taken from: (1) the DOC Defendants' concise statement of material facts (ECF 115), Plaintiff's response and counter statement of facts (ECF 131) and the DOC Defendants' response to his counter statement (ECF 140); (2) the Medical Defendants' concise statement of material facts (ECF 119), Plaintiff's response and counter statement of facts (ECF 130) and the Medical Defendants' response to his counter statement (ECF 138); (3) Plaintiff's concise statement of material facts (ECF 122) and the Medical Defendants' and DOC Defendants' responses to it (ECF 126, 142); and (4) the exhibits contained in the summary judgment record, including three declarations submitted by Plaintiff (ECF 121-6 ("Pl's Decl. I"); ECF 130-3 ("Pl's Decl. II") and ECF 130-9 ("Pl's Decl. III"). Disputed facts are noted where relevant.

general assertion, but the Medical Defendants contend "it oversimplifies medical decisions that are made at SCI-Greene for every inmate when medical treatment is decided on a case-by-case basis as medically necessary." (ECF 126 ¶ 17.)

The DOC Defendants responded to one or more grievances filed by Plaintiff relevant to this action. When responding to an inmate grievance, the DOC Defendants would review relevant medical records. They also would typically speak to the relevant service provider to get his or her input before preparing a response. On occasion, the DOC Defendants would also speak to the inmate. The DOC Defendants followed their normal practice in responding to grievances filed by Plaintiff. (ECF 115 ¶¶ 11-14, 20-22.)

Plaintiff does not dispute he had access to medical providers and clinicians while at SCI Greene. However, he contends that on certain occasions his reasonable requests for medical attention were denied. (ECF 115 ¶ 9; ECF 131 ¶ 9.)

<u>Plaintiff's May 26, 2017 Sick Call Visit With Dr. Smyth and Subsequent Events</u>

On May 26, 2017, when Plaintiff was housed in a psychiatric observation cell ("POC"), he informed Dr. Smyth[4] he hurt or "tweaked" his neck a few months earlier and although he was taking Tylenol, it was not improving his pain. (ECF 119 ¶ 3; ECF 117 p. 4; ECF 121-6, Pl's Decl. I ¶ 2.) Dr. Smyth ordered a 30-day prescription of Naprosyn (Naproxen), a nonsteroidal anti-inflammatory drug ("NSAID"), to be taken two times daily, as well as physical therapy. Dr. Smyth planned to follow up in two weeks. (*Id.*) When Plaintiff departed the POC two days later, a nurse recorded that he had no medical concerns at the time. (ECF 119 ¶ 5; ECF 117 p. 14.)

---

[4] Dr. Smyth's name changed during the events in question and she also appears in Plaintiff's medical records as Dr. Daniel. References herein to either Dr. Smyth or Dr. Daniel refers to the same person.

Plaintiff had a physical therapy appointment scheduled for June 8, 2017. The consultation record for that date reflects he was not seen because he was in the Restricted Housing Unit ("RHU"). (ECF 122 ¶ 2; ECF 121-2 pp. 2-3.)

On June 29, 2017, Plaintiff had an appointment with John Kushner, a physical therapist. Kushner assessed Plaintiff as having a left low cervical sprain/strain and instructed him on the use of deep cervical flexion isometrics and thoracic spine stretches. Kushner noted Plaintiff should have one or two follow-up physical therapy sessions. (ECF 119 ¶ 6; ECF 117 p. 14; ECF 121-3 pp. 2-4; ECF 121-6, Pl's Decl. I ¶ 3.)

Plaintiff's next physical therapy session was scheduled for the morning of July 13, 2017. He avers he missed that appointment because another inmate used his medical pass. (ECF 121-6, Pl's Dec. I ¶ 4; ECF 122 ¶¶ 5-6; ECF 121-5 p. 2.)

Plaintiff saw Dr. Jayakumar on September 18, 2017 for his complaint of recurrent neck pain. Plaintiff informed her that he started physical therapy but his follow-up visits were canceled. Plaintiff requested more physical therapy. Following the exam, Dr. Jayakumar prescribed a Medrol dose pack. She also placed orders for an X-ray of Plaintiff's neck and a re-evaluation by physical therapy. She advised Plaintiff to place a sick call "next week or sooner if symptoms worsen or persist." (ECF 119 ¶ 7; ECF 117 p. 15.)

Plaintiff underwent an X-ray study of his neck on September 20, 2017. The study revealed mild scoliosis with no fracture or dislocation. (ECF 119 ¶ 8; ECF 117 p. 5.)

<u>Plaintiff Submits a Request Slip to Defendant Nicholson and his Sister's Call</u>

In a Request to Staff submitted to Defendant Nicholson, dated September 23, 2017, Plaintiff wrote that he missed one of the physical therapy appointments scheduled following his

appointment with Dr Smyth because a corrections officer "accidentally gave my pass to another inmate." He also wrote: "A month went by and I was not put back on. I asked the nurse and was told to put a slip in but I would not be charged because I was diagnosed and already being seen. I put in [a] sick call and got seen and prescribed more meds [and] put back on physical therapy but was charged $10.00. I shouldn't have been charged for a staff mess up nor because this is a long standing medical illness that needs follow ups. Please refund my $10.00." (ECF 121-8 p. 11.)

In his September 27, 2017 response, Defendant Nicholson wrote: "You were not missed. You were in the RHU. Your treatment starts all over again after release from the RHU. A new consult will need [to be] entered (and I will make that happen) and you will have to restart PT again. The charge is valid." (*Id.*)

Plaintiff avers that during the week of September 25, 2017 he put in a sick call request to get further treatment and medication but he "never got called up for the pain, [and] medical called the block and told the [corrections officer] to relay that [Plaintiff] would be put on for a follow-up." (ECF 121-6, Pl's Decl. I ¶¶ 5-6; ECF 122 ¶ 11.) A September 25, 2017 notation made by a nurse on a physician's order form reflects Plaintiff was to be placed on Dr. Jayakumar's line that week for a follow-up. (ECF 121-7 p. 3.) The DOC and Medical Defendants contend there is no evidence, aside from Plaintiff's averment in his declaration, that he submitted any sick call request that was canceled or denied on or around the week of September 25, 2017. (ECF 126 ¶ 11; ECF 142 ¶ 11.)

Plaintiff had an annual physical exam on October 23, 2017. On the Physician's Order, which was signed by Dr. Jayakumar, Plaintiff was assigned the classification of "medically stable." (ECF 117 p. 8.)

Cassandra Brodsky-Walls is Plaintiff's sister. In her declaration,[5] she avers that she called SCI Greene "sometime in between [O]ctober, December 2017" and expressed her concern to Defendant Nicholson that Plaintiff was not receiving "physical therapy [or] follow ups to get medication for his pain." (ECF 139-1, Brodsky-Walls' Decl. ¶ 3.) According to Brodsky-Walls, Defendant Nicholson informed her that he would see to it that Plaintiff would "get seen and get physical therapy." (*Id.*)

As discussed below, Plaintiff's medical records reflect that his next physical therapy session was on May 17, 2018 and was scheduled following an April 10, 2018 sick call visit with Dr. Santos.

<u>Plaintiff's April 10, 2018 Sick Call Visit With Dr. Santos</u>

On April 10, 2018, Plaintiff saw Dr. Santos for a complaint of neck pain. Plaintiff reported that he had chronic neck pain for two years that "had been worse on and off." Plaintiff also said that he experienced some radicular pain in the left arm. Dr. Santos noted that Plaintiff had some neck tenderness along the level of C7 on palpation and digital pressure, and that his range of motion was normal but limited by pain on hyperextension and flexion. Dr. Santos assessed Plaintiff with a neck strain, to be treated with steroids and physical therapy. (ECF 119 ¶ 10; ECF 117 p. 184).

Following his appointment with Dr. Santos, Plaintiff was prescribed a dose pack (six-day supply) of Prednisone and 30-day supply of Mobic, to be taken once daily. (ECF 122 ¶ 21; ECF 121-14 p. 4; ECF 117 p. 271-75; ECF 121-14 p. 4.) Dr. Santos also placed a request for three physical therapy consultations. (ECF 122 ¶ 20; ECF 126 ¶ 20; ECF 121-13 p. 2.)

---

[5] Defendants point out that the first of Brodsky-Walls' declarations was unsworn. (ECF 130-7 pp. 2-3.) Thereafter, Plaintiff submitted another declaration by her that was identical to the first in all respects except she signed it under penalty of perjury. (ECF 139-1 pp. 2-3.)

Plaintiff had a session with Kushner, the physical therapist, on May 17, 2018. Kushner instructed him on various exercises, including deep cervical V or isometrics, mid back stretches, and row and lat pulldowns to be conducted in the gym. Kushner recorded that Plaintiff had one physical therapy visit the previous year which provided "minimal help." He assessed Plaintiff with a neck strain and noted that the treatment plan was to continue with one or two more physical therapy sessions. (ECF 119 ¶ 11; ECF 117 pp. 234-35; ECF 122 ¶ 22; ECF 126 ¶ 22; ECF 121-15 p. 2.)

<u>Defendant Tormey's Four Sick Call Visits With Plaintiff Between May-August 2018</u>

1. <u>May 18, 2018 visit</u>

Defendant Tormey saw Plaintiff on May 18, 2018 in response to a sick call request in which he complained of extremely clogged ears. Plaintiff told her he could not hear well and was experiencing ringing and roaring noises in his ears. He reported that the symptoms had been ongoing for several days and became worse after using a Q-tip. Defendant Tormey recorded in her progress notes that Plaintiff also "describ[ed] symptoms that he self-identified as signs of impending panic attack and hyperventilation such as breathing too fast, lips getting numb, thoughts racing, feeling strange sensations all through chest[,]" and said "he's a very anxious person." (ECF 117 p. 181; ECF 119 ¶ 12.)

Defendant Tormey examined Plaintiff and noted that his left ear was completely impacted with wax and his right ear was 75% impacted. She assessed him with bilateral cerumen impaction. The treatment plan was to use ear drops through May 24, 2018. Defendant Tormey also scheduled Plaintiff for a follow-up visit with her on May 23, 2018. (ECF 117 p. 181.)

Plaintiff states Defendant Tormey did not record in her progress notes all the complaints

10

he reported to her during this May 18, 2018 sick call visit. (ECF 130 ¶ 12.) He avers he also requested treatment for his neck pain because his medication had expired. (ECF 130 ¶ 78; ECF 130-9, Pl's Decl. III ¶ 1.) According to Plaintiff, Defendant Tormey "advised [him] that Dr. Smyth will see him soon." (ECF 130-9, Pl's Decl. III ¶ 1.)

2.  <u>May 23, 2018 visit</u>

Plaintiff had a follow-up exam with Defendant Tormey on May 23, 2018 to recheck his ears, as his left ear was still bothering him. Defendant Tormey noted that Plaintiff's left ear was still showing inflammation and abrasion of external canal. She assessed external inflammation and provided him with drops for his ears to use at bedtime and flushed his ears. (ECF 119 ¶ 13; ECF 117 p. 180; ECF 130-9, Pl's Decl. III ¶ 2.)

Plaintiff states that during this May 23, 2018 visit he also advised Defendant Tormey that he required treatment for his neck pain and had not been seen by Dr. Smyth. According to Plaintiff, Defendant Tormey advised him that his anxiety was "causing most of [his] pain" and that she would "tell Dr. Smyth to see him." (ECF 121-6, Pl's Decl. I ¶ 9; ECF 130-9, Pl's Decl. III ¶ 2.)

Following this May 23, 2018 visit with Defendant Tormey, Plaintiff saw another nurse and the physical therapist. RN Grabowski examined him on June 11, 2018. He complained that for about a week he had been experiencing intermittent head compression, tingling in his right arm, and left chest pain. She noted that Plaintiff had a history of anxiety. An EKG study was performed and Plaintiff was instructed to place a sick call if his condition worsened. (ECF 119 ¶ 14; ECF 117 pp. 176-79.) On June 26, 2018, Plaintiff had a physical therapy session with Kushner, who assessed cervical pain/strain and instructed Plaintiff to return for another visit. (ECF 119 ¶ 15; ECF 117 pp. 228-31).

11

### 3. July 6, 2018 visit

Plaintiff again saw Defendant Tormey for a sick call visit on July 6, 2018. She noted he needed to have his ears flushed and that he had written in his sick call request that he was experiencing an earache and chest pain. Defendant Tormey also noted that Plaintiff reported feeling very anxious and said that when he becomes anxious he has physical symptoms, which then leads him to become more anxious. Plaintiff also told her he had neck and back problems from a motor vehicle accident that occurred fifteen years earlier. (ECF 117 p. 175.)

According to Plaintiff, he told Defendant Tormey during this visit that he disagreed with her assessment that his symptoms were caused by his anxiety. He states he explained to her that he had experienced panic attacks for years and "could tell that the symptoms were not anxiety as she continued to advise[.]" (ECF 130-9, Pl's Decl. III ¶ 3.) Plaintiff states that he asked Defendant Tormey to prescribed medication to relieve his neck pain and told her he still had not been seen by Dr. Smyth. (*Id.*) He states: "I also tried to give [Defendant Tormey] a general detail of my neck injury, that it came from [a motor vehicle accident] when I was 18 years old and that I was in [physical therapy] and tweaked it at the gym doing PT exercises, and [it] hurts to move [his] neck" and he was in a lot of pain. (*Id.*) Plaintiff states he told Defendant Tormey that during his last physical therapy session, the physical therapist advised that if his condition was not improving by his next visit that "he would recommend injections for pain in neck and testing." (*Id.*)

During this sick call visit, Defendant Tormey examined Plaintiff's ears, which appeared clear. She recorded in her progress notes: "reassured [Plaintiff] that he has no medical issues to be treated…at this time with regard to his ears. Also reminded him that he tends to get anxious and comes to medical with physical complaints to get checked out. If his medication is not helping

with his anxiety he needs to see the psych provider. [Plaintiff] verbalized his understanding of this." (ECF 117 p. 175.)

Following this sick call visit, Plaintiff had another physical therapy session with Kushner. After this session on July 19, 2018, Kushner noted Plaintiff's cervical pain was ongoing and was not improving with physical therapy. Kushner concluded Plaintiff may benefit from a consult for an injection or further diagnostic testing and should not continue with physical therapy. (ECF 119 ¶ 17; ECF 117 p. 210.)

#### 4. August 1, 2018 visit

Defendant Tormey saw Plaintiff during a sick call visit on August 1, 2018 for his complaints of his ears pounding, feeling strange in his head, and rapid heart rate. Plaintiff told her that his rapid heart rate had started abruptly the night before. Defendant Tormey recorded that Plaintiff appeared "frenzied, his face [was] flushed as he verbally jumped from descriptions of symptoms in one body system to the next exclaiming and waving his arms pointing to various areas." On exam, Plaintiff's heart had a regular rate and rhythm without murmur. His lungs were clear bilaterally. Defendant Tormey placed orders for lab work and an EKG study and planned to follow up as needed once test results were available. (ECF 119 ¶ 18; ECF 117 p. 170-74).

Plaintiff avers that during this sick call visit he informed Defendant Tormey that he was experiencing worsening neck pain and was continuing to have panic attacks because she was not helping him. According to Plaintiff, Defendant Tormey cut him off, advised him "to see psych," and told him that if he did not stop complaining she would have "have security take [him] to the hole." (ECF 130 ¶ 81; ECF 130-9, Pl's Decl. III ¶ 4.)

Plaintiff was seen by psychiatry on August 16, 2018. (*See* ECF 116-1 p. 38; ECF 116-2 pp.

17.)

<u>Defendant Nicholson Responds to Grievance 750459</u>

Plaintiff submitted Grievance 750459, which is dated August 6, 2018. In this grievance, Plaintiff complained that Defendant Tormey did not provide him treatment for his pain and dismissed his medical issues as mental health issues. (ECF 116-2 pp. 15-16.)

Defendant Nicholson denied Grievance 750459. In his August 24, 2018 response, Defendant Nicholson wrote that he reviewed Plaintiff's medical records, spoke with the appropriate staff, and concluded Plaintiff was receiving proper medical care. Defendant Nicholson also wrote that Defendant Tormey examined Plaintiff and "all assessments were negative for any medical issues…. You feel that you were being dismissed when she told you to stop talking. She was doing an assessment and you were telling her things that she had already been told. You were not dismissed. You were seen by psychiatry on 8/16/18. According to the provider, your symptoms were related to anxiety." (*Id.* p. 17.)

<u>Brodsky-Walls Speaks With Defendant Wood</u>

Brodsky-Walls avers she spoke with Defendant Wood numerous times in August and September 2018 to inform her that Plaintiff was not being treated properly for the pain he was experiencing. (ECF 139-1, Brodsky-Walls' Decl. ¶¶ 5-11.) In her declaration, Defendant Wood states that she has no specific recollection of speaking with any member of Plaintiff's family in August or September 2018, but explains that in her role as a CHCA she would often speak with inmates' relatives. (ECF 116-1 p. 10, Wood's Decl. ¶ 16.)

According to Brodsky-Walls, she called Defendant Wood three times in early August 2018. Although Defendant Wood assured her that she was taking her concerns seriously and would have

Plaintiff seen by a doctor, he was not seen by a doctor in August 2018 to address the matters about which she called Defendant Wood. (*Id.* ¶¶ 5-10.)

Plaintiff asserts that on August 28, 2018, while he was packing and moving his property during a move to another block, he irritated his neck injury and his pain "flared up[.]" (ECF 130-3, Pl's Decl. II ¶ 15.) The DOC had a statewide lockdown the next day that lasted nearly two weeks. (ECF 122 ¶ 31; ECF 142 ¶ 31.) Plaintiff states he "was in severe pain where I couldn't move [my] neck at all or sleep." (ECF 121-6, Pl's Decl. I ¶ 11.) He also avers that no requests to staff or sick call slips were being picked up during the lockdown and, therefore, an inmate could only make a verbal request for medical attention. (*Id.*; *see also* ECF 122 ¶ 31; ECF 142 ¶ 31.) He states that he made a verbal request for medical attention but an unidentified individual told him "medical is not seeing anyone right now." (ECF 121-6, Pl's Decl. I ¶ 11.)

According to Brodsky-Walls, she called SCI Greene on September 4 and 5, 2018, spoke to Defendant Wood, and informed her that Plaintiff was in pain and was not able to be seen by medical due to the lockdown. Brodsky-Walls states that Defendant Wood assured her the medical department was seeing inmates during the lockdown and she would see to it that Plaintiff was seen right away. (ECF 139-1, Brodsky-Walls Decl. ¶¶ 2-3.) It is not disputed that Plaintiff was not seen by medical until September 7, 2018.

<u>Plaintiff's Medical Care Between September 7, 2018 and January 2, 2019</u>

Plaintiff avers that on September 7, 2018 he "begged [a sergeant] to make medical see [him] for all of my pain and finally medical emergency triaged [him] and the nurse gave [him] ice and Motrin and put [him] into the infirmary" for pain and an elevated blood pressure. (ECF 130-3, Pl's Decl. II ¶ 18.) Plaintiff's medical records reflect that he was admitted to the infirmary just

after 5:00 p.m. on September 7, 2018 due to complaints of neck, back, and shoulder pain. He reported that he had been experiencing pain for a week. Plaintiff was to be evaluated by Dr. Daniel in the morning. (ECF 119 ¶ 19; ECF 117 p. 164-69.)

Plaintiff does not challenge the level of medical care and treatment he received from September 7, 2018 through January 2, 2019. (*See* ECF 122 ¶¶ 35-39; ECF 121-6, Pl's Decl. I ¶¶ 13-14; ECF 130-3, Pl's Decl. III ¶¶ 19-22.) Nevertheless, the medical treatment and testing that occurred between these dates is relevant to his claims against Defendant Nicholson related to an incident that occurred on January 3, 2019, and his claims against Defendant Hammer following the September 17, 2019 sick call visit.

Dr. Daniel saw Plaintiff on September 8, 2018 at his cell door and discharged him from the infirmary, noting that he had been on multiple medications and had had physical therapy. She also noted that Plaintiff was not in acute distress and his neck and left arm were observed with full range of motion. Her assessment included neck sprain/strain. Dr. Daniel noted that she planned to discuss Plaintiff's condition at collegial and possibly get an MRI of the cervical spine. (ECF 119 ¶ 21; ECF 117 pp. 160-61.) On the same date, Plaintiff was provided injections of Toradol and Kenalog. (ECF 119 ¶ 20; ECF 117 p. 162-63). He states "the injections did help for a few days and eased the severity of all the pain" in his neck. (ECF 130-3, Pl's Decl. II ¶ 20.)

On September 26, 2018, Dr. Jayakumar saw Plaintiff in sick call as a follow-up visit. Dr. Jayakumar recorded in her notes that Plaintiff complained of left neck pain and requested narcotic medication and an MRI of his neck. Plaintiff reported a range of symptoms, including numbness, tingling, and radiation down his left arm. On exam, he had mild tenderness of the trapezius muscle bilaterally with minimal spasm without any trigger points. (ECF 119 ¶ 25; ECF

117 pp. 146-47.)

Dr. Jayakumar's assessment of Plaintiff included cervical/trapezius muscle strain/pain, psychiatric disorder, and tobacco abuse. The treatment plan was to discontinue Naprosyn, prescribe Voltaren (Diclofenac), and prescribe Zostrix cream. A biofreeze balm was applied topically to the cervical region in the office, which Plaintiff said provided some relief. Dr. Jayakumar advised Plaintiff to follow up with his psychiatrist to discuss his medications. She also advised him to return to medical if his symptoms worsened or new symptoms developed. An MRI of the c-spine was to be discussed with the collegial team. (*Id.*)

Plaintiff underwent an MRI study on October 4, 2018. It revealed mild degenerative disc disease at C6-C7 with moderate left posterior disc herniation causing mild central spinal canal stenosis on the left but not on the right, and mild flattening of the left anterior margin of the spinal cord. (ECF 117 p. 145, 224-25.)

On October 15, 2018, a medical incident report noted that on that date, Plaintiff swallowed twenty-five tablets of Tylenol in front of a corrections officer. He was transported to the hospital for evaluation. (ECF 119 ¶ 27; ECF 117 pp. 132-40.) Following evaluation at the hospital, the assessment included Tylenol overdose. (ECF 119 ¶ 28; ECF 117 pp. 211-22.) Plaintiff was returned to SCI Greene that day and placed under 23-hour observation in the infirmary. (ECF 119 ¶ 29; ECF 117 pp. 128-30.)

On that same date, a nurse recorded in her psychiatry progress notes that Plaintiff's cellmate admitted to taking multiple tablets of Benadryl, which created suspicion that Plaintiff was diverting Benadryl. Plaintiff's Celexa and Buspar were discontinued due to poor compliance, and an order was placed for his Benadryl to be crushed and floated until an assessment could be made

regarding its necessity. The following day Plaintiff was started on Prozac (fluoxetine) 20mg, one tablet daily. (ECF 117 pp. 141-42, 291).

On December 11, 2018, Plaintiff underwent an Electromyography ("EMG")/nerve conduction study at Laurel Physiatry. The doctor who conducted the exam noted that Plaintiff's cervical range of motion was intact and his reflexes of the upper extremities were symmetric. The EMG study revealed normal findings with no obvious cervical radiculopathy or myopathy. There was no evidence of neuropathy involving the left upper limb. (ECF 117 pp. 125, 206-29).

On December 17, 2018, Dr. Daniel placed a request for Plaintiff to be seen for a neurosurgical consultation. In her referral comments, she reported: "[Plaintiff] is 29 year old male with a history of neck pain. He has had an EMG and MRI done. Has tried multiple medications and [physical therapy]. MRI showed left posterior disc herniation causing mild central spinal canal stenosis on left. EMG was normal. To see neurosurgery for treatment options and to see if [he] is a surgical candidate. Approved by collegial." (ECF 117 p. 201.)

<u>The January 3, 2019 Incident</u>

Plaintiff avers that he experienced severe neck pain when he moved property in his cell on January 3, 2019. He states he reported this issue to CO Fenton who then "called medical." CO Fenton advised Plaintiff that "medical" said he had to put in a sick call slip. (ECF 121-6, Pl's Decl. I ¶ 14.) Plaintiff asserts that since it was a Thursday, even if he had submitted a sick call slip that day, he would have had to wait until Monday to receive medical attention. (ECF 122 ¶ 42.) Defendant Nicholson acknowledged in his response to Plaintiff's Request for Admission that it is "usually" the case that an inmate who submits a sick call slip on a Thursday will have to wait until at least the following Monday to be seen by a provider. (ECF 121-8 p. 8.)

18

Brodsky-Walls avers that Plaintiff called her on January 3, 2019 and told her "his neck was hurting bad and wasn't able to move it" and that a corrections officer told him he had to place a sick call slip. Brodsky-Walls called Defendant Nicholson and told him that Plaintiff "was in pain, and could not move his neck and should not have to wait 5 days to get seen because of [the] weekend." (ECF 139-1, Brodsky-Walls' Decl. ¶ 12.) According to Brodsky-Walls, Defendant Nicholson told her Plaintiff was lying and a corrections officer had informed him that Plaintiff "was walking around fine." Brodsky-Walls asserts that after she challenged Defendant Nicholson's statements, he told her that he would have Plaintiff seen by a medical provider the next morning, on Friday January 4, 2019. (*Id.*)

When he was not seen, Brodsky-Walls asserts that she spoke with Defendant Nicholson again and asked why Plaintiff had not been seen yet by a medical provider. According to Brodsky-Walls, Defendant Nicholson told her that a doctor was not in and, therefore, Plaintiff would have to wait until Monday to be seen by a provider. (ECF 139-1, Brodsky-Walls Decl. ¶ 13.)

Plaintiff was not seen by a medical provider that Monday. (ECF 131 ¶ 51; ECF 140 ¶ 51; ECF 116-1 p. 5, Nicholson's Decl. ¶ 23.) Brodsky-Walls asserts she called Defendant Nicholson again and he assured her Plaintiff would be seen by a provider on January 10, 2019. (ECF 139-1, Brodsky-Walls Decl. ¶ 14.) As discussed below, Plaintiff was seen by Defendant Tormey on Thursday, January 10, 2019.[6] (ECF 117 p. 123.)

In his declaration, Defendant Nicholson states that he recalls speaking with Brodsky-Walls on January 3, 2019, and during their conversation she expressed her concerns about Plaintiff's

---

[6] Plaintiff does not assert that the medical care Defendant Tormey provided to him during this visit was inadequate.

condition. Specifically, she relayed that he was experiencing neck pain and was in so much pain "he was currently on the floor unable to move." (ECF 116-1 p. 5, Nicholson Decl. ¶¶ 21-22.) Defendant Nicholson states he advised Brodsky-Walls that he would look into the matter and have Plaintiff scheduled with a clinician the following day, January 4, 2019. (*Id.* ¶ 22.)

Defendant Nicholson states that immediately after he ended his discussion with Brodsky-Walls, he called Plaintiff's "unit to check on [Plaintiff] and was told that he not only didn't complain to them about pain, but he was currently in the exercise yard." (*Id.*) Therefore, Defendant Nicholson explains, he "did not have [Plaintiff] seen 'emergently' because there was no emergency." (*Id.*) Defendant Nicholson did request, however, that Plaintiff be seen by a clinician, and his medical records confirm that Defendant Tormey examined him on Thursday, January 10, 2019. (*Id.* ¶ 23.)

Defendant Nicholson does not remember with whom he spoke when he called Plaintiff's unit. (ECF 121-26 p. 3.) Plaintiff states he asked CO Fenton and a sergeant who worked on his unit about this and they said they did not speak with Defendant Nicholson on the date in question. (ECF 121-6 ¶ 18.)

Plaintiff's medical records reflect that his January 10, 2019 appointment was scheduled after a "family member called to report [he] was in 'dire pain' and not getting any help for it." (ECF 117 p. 123.) In her progress notes, Defendant Tormey recorded that Plaintiff "describes tweaking his neck and a pinching sensation but 'nowhere near as bad as the original injury' but was still not going away." (*Id.*) Defendant Tormey noted that Plaintiff had a normal gait and he "was observed on the walkway to be talking to other staff and inmates and turned his head to speak to them. Then was observed looking down at the ground with his neck in flexion and then

straightened it without difficulty. While describing his issues he gestures freely and points to various areas of pain shooting down his arm or 'numbness'[.]" (*Id.*)

Defendant Tormey assessed Plaintiff as having a neck sprain/strain. The treatment plan was to provide injections of Methylpred SOD 125mg (Solu-Medrol) and Ketorolac 60mg/2mL (Toradol) once daily over the next two days. She advised Plaintiff he would be going to a neurology consultation, and explained to him that although NSAIDs were initially ordered, they were canceled because of risks of gastrointestinal bleeding. (*Id.*)

Plaintiff filed Grievance 780276 in which he complained that he was not seen by a medical provider on January 3, 2019 after he informed Officer Fenton that he was in severe pain and Brodsky-Walls called SCI Greene. (ECF 163 pp. 29-30.) Defendant Nicholson was initially assigned to respond to this grievance. However, because he was mentioned in it, it was reassigned to John McAnary. (*Id.* pp. 31-34.)

McAnary denied Grievance 780276, explaining that after Defendant Nicholson spoke with Plaintiff's family member on January 3, 2019, he called Plaintiff's unit and was informed by an officer that Plaintiff was in the exercise yard and made no mention of being in pain. Therefore, McAnary explained, Defendant Nicholson determined there was no emergency and that Plaintiff would have to follow the normal procedures and submit a sick call slip if he wanted to see a medical provider. (*Id.* p. 34.)

<u>Plaintiff's Medical Care From January 28, 2019 to September 17, 2019</u>

On January 28, 2019, Plaintiff had an outside neurosurgery consult with Dr. Linda Xu of AGH Neurosurgery. She assessed a cervical strain with radiculitis and right shoulder pain. The plan was to start Neurontin (Gabapentin) for left upper extremity pain. (ECF 119 ¶ 34; ECF 117

pp. 122, 201-05.)

Dr. Daniel reviewed the neurosurgery notes on February 11, 2019. She observed that neurosurgery recommended medical management and she was awaiting approval of Neurontin, a non-formulary medication. (ECF 119 ¶ 35; ECF 117 p. 121.)

On February 13, 2019, Dr. Daniel met with Plaintiff to review the neurosurgery visit. She advised he was not considered to be a surgical candidate and that medical management was recommended for his neck pain and radiculopathy. Dr. Daniel recorded in her progress notes that Plaintiff continued to have muscle spasms and tightness in his neck. She prescribed Neurontin, 100mg, three times daily through March 13, 2019. (ECF 119 ¶ 36; ECF 117 pp. 119-20.)

Dr. Daniel again saw Plaintiff for his neck pain on March 1, 2019. He reported continued muscle spasms and tightness in his neck. She recorded that the treatment plan was to prescribe Baclofen at that time and to consider increasing his Neurontin if symptoms continued. (ECF 119 ¶ 37; ECF 117 pp. 117-18.)

Dr. Daniel saw Plaintiff again on March 7, 2019 for a medication refill. She refilled the prescriptions of Neurontin and Baclofen. (ECF 119 ¶ 38; ECF 117 p. 116.)

On April 17, 2019, Dr. Daniel noted that she received a report from nursing that Plaintiff may be diverting his medication. Therefore, a crush order was placed for the Neurontin. (ECF 119 ¶ 40; ECF 117 pp. 104, 312-13.)

Dr. Daniel continued to adjust Plaintiff's medications as medically appropriate over the next several months. He was seen by medical staff for any medical complaints that he made. (ECF 119 ¶¶ 42-53.)

<u>Defendant Hammer's September 17, 2019 Sick Call Visit With Plaintiff</u>

On September 17, 2019, Defendant Hammer saw Plaintiff at his cell door regarding his request that Naprosyn and Protonix be renewed. Defendant Hammer noted that Plaintiff was started on Protonix for gastrointestinal irritation due to NSAID use for neck and shoulder pain. Plaintiff also requested during this visit a renewal of the Neurontin that Dr. Daniel had previously prescribed. (ECF 119 ¶ 54; ECF 117 pp. 65-66.)

Defendant Hammer recorded in his notes that Plaintiff appeared well and exhibited no overt pain behavior. He reviewed the neurosurgery consult as well as the results of the EMG study, which was normal. Defendant Hammer noted that an MRI revealed a small C6-C7 protrusion without compression. He reviewed Plaintiff's medications. His assessment included cervical strain with radiculitis. (*Id.*)

Defendant Hammer also discussed with Plaintiff the need to reassess treatment. He advised that the plan was to start Tylenol to reduce gastrointestinal symptoms and to use Zantac as needed. Neurontin was to be changed to Cymbalta. (*Id.*) Defendant Hammer recorded in his notes he "[d]iscussed med change with Dr. Pillai[,]" and that per Connie Wettgen of psych, Prozac could be discontinued and Cymbalta initiated. He noted that Plaintiff was "made aware of changes." (*Id.*)

The order to discontinue Prozac was submitted by Dr. Pillai. The order to discontinue Neurontin was submitted by Dr. Daniel. (*Id.*; ECF 117 pp. 300-31.)

Defendant Hammer's progress notes for September 19, 2019 reflect that on that date Plaintiff requested to see a doctor so that he could be prescribed Neurontin. His assessment included cervical strain. Defendant Hammer referred to his previous notes and planned to continue the treatment plan discussed with Plaintiff during the September 17, 2019 sick call visit. (ECF 119

23

¶ 55; ECF 117 pp. 62-63.)

Plaintiff avers he asked Defendant Hammer why he stopped his Neurontin, which was the medication recommended by a specialist and previously ordered by Dr. Daniel. He states Defendant Hammer told him that "there are other formulary medication that [Plaintiff] could try." (ECF 121-6, Pl's Decl. I ¶ 21.) Plaintiff states he also told Defendant Hammer that he had previously been prescribed Cymbalta and could not take it because he had adverse reactions to it. (*Id.*)

Plaintiff asserts he informed Defendant Hammer that Prozac was effectively treating his depression and he asked why Defendant Hammer "would even mess with [his] mental health meds[,]" and abruptly stop the Neurontin and Prozac. Plaintiff states he told Defendant Hammer he was experiencing withdrawal symptoms. According to Plaintiff, Defendant Hammer told him he would not see a physician in the RHU and walked away. (*Id.*)

On September 20, 2019, Shanda Weeden saw Plaintiff at his cell door in the RHU for a mental health visit. She noted that Plaintiff said he was doing well but complained that Defendant Hammer stopped his Prozac. Weeden also noted that Dr. Silberschmidt, a psychiatrist, planned to have a follow-up visit with Plaintiff. (ECF 119 ¶ 56; ECF 117 pp. 61-62.)

Dr. Silberschmidt met with Plaintiff on September 26, 2019. She noted he was taking Benadryl and was also prescribed Cymbalta by medical for pain. Plaintiff told Dr. Silberschmidt he was throwing the Cymbalta in the toilet because he did not like it. He also said that he liked Prozac and wanted to restart it. Dr. Silberschmidt noted that the treatment plan was to have Cymbalta stopped since Plaintiff was throwing it away, and to restart him on Prozac. She informed Defendant Hammer of these decisions and submitted an order for Prozac to be started that day.

(ECF 119 ¶ 58; ECF 117 pp. 56-58, 331; *see also* ECF 121-6, Pl's Decl. I ¶ 23.)

<u>Plaintiff's Grievance Pertaining to His Claims Against Defendant Hammer</u>

Plaintiff filed Grievance 825883 on or around September 27, 2019 in which he complained that Defendant Hammer had discontinued his Neurontin and Prozac and instead prescribed Cymbalta. He also asserted that he was not given appropriate information to make an informed decision about taking Cymbalta. Additionally, Plaintiff asserted that Defendant Hammer conducted a medical visit with him in the RHU on September 17, 2019 at his cell door within hearing distance of other inmates and, therefore, did not maintain his privacy. (ECF 117-1 p. 205.)

J. Mearney denied Grievance 825883 on October 21, 2019. Plaintiff filed an appeal to the facility manager on October 24, 2019. (*Id.* p. 207-09.)

As discussed above, Plaintiff brought this lawsuit on or around October 29, 2019. The facility manager at SCI Greene responded to Grievance 825883 regarding Defendant Hammer on November 14, 2019 and upheld the initial denial. (ECF 119 ¶ 72; ECF 117-1 p. 210.) Plaintiff appealed that decision. On December 11, 2019, the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") referred the grievance to the Bureau of Health Care Services for further review. Plaintiff was notified of the referral and a possible delay in a response. (ECF 119 ¶ 74; ECF 117-1 p. 202-03.) On December 20, 2019, SOIGA issued its final appeal decision to Grievance 825883 in which it upheld the lower denials of the grievance. (ECF 119 ¶ 76; ECF 117-1 p. 202-03.)

## III.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine, material dispute and an entitlement to judgment. *Id.* at 323. This showing does not necessarily require the moving party to disprove the opponent's claims. Instead, this burden may often be discharged simply by pointing out for the court an absence of evidence in support of the non-moving party's claims. *Id.*; *see, e.g., Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015).

Once the moving party has met its initial burden, then the burden shifts to the non-moving party to demonstrate, by affidavit or other evidence, "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A non-moving party must "go beyond the pleadings" and show probative evidence creating a triable controversy. *Celotex*, 477 U.S. at 324. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cnty Family YMCA*, 418 F.3d 265,266 (3d Cir. 2005); *Doe v. Cnty of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary

judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial. *See, e.g., Barnett v. NJ Transit Corp.*, 573 F. App'x 239, 243 (3d Cir. 2014) (holding that the *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories…sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law."); *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (*pro se* plaintiffs "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.")

## IV.  Discussion

Plaintiff brings his constitutional tort claims against each defendant under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Importantly, § 1983 does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

"The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (internal quotations and citations omitted). "Next, a plaintiff must

demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). That is because only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under § 1983. Thus, importantly, each defendant in this civil action can be held liable only for his or her own conduct. *See, e.g., Rode*, 845 F.2d at 1207; *see also Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016); *Barkes v. First Correctional Medical*, 766 F.3d 307, 316 (3d Cir. 2014) (*rev'd sub. nom. on other grounds* 575 U.S. 822 (2015)); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it.") (citing *C.H. v. Oliva*, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

Most of Plaintiff's claims assert that each of the defendants violated his Eighth Amendment rights related to his medical care. "The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). In *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976), the Supreme Court held that this principle "establish[es] the government's obligation to provide medical care for those whom it is punishing by incarceration[,]" and that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of a pain'…proscribed by the Eighth Amendment."

To establish his Eighth Amendment claims in this case, Plaintiff must prove two things. First, he must make an objective showing that his medical needs were serious. *See, e.g., Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

> A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citation omitted). A medical need is also serious where the denial of treatment would result in the "unnecessary and wanton infliction of pain," *Estelle*, 429 U.S. at 103, or a "life-long handicap or permanent loss," *Lanzaro*, 834 F.2d at 347.

*Atkinson v. Taylor*, 316 F.3d 257, 272 (3d Cir. 2003) (parallel citations omitted).

Second, Plaintiff must make a subjective showing that the defendant at issue was deliberately indifferent to his serious medical need. *See*, *e.g.*, *Rouse*, 182 F.3d at 197. The Supreme Court has described the state of mind that deliberate indifference requires:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement *unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw that inference.*

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added).

"[D]eliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson*, 850 F.3d at 535. It has been found "in a variety of circumstances," *Rouse*, 182 F.3d at 197, including where a prison official "knows of a prisoner's need for medical treatment but intentionally refuses to provide it[,]" or "prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), which cited *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987)). Since a defendant's state of mind, like other facts, can be proved by circumstantial evidence, the *Farmer* standard does not require a defendant to admit his consciousness of the risk of serious harm before liability can be imposed. However, even gross errors of judgment are not constitutional violations: liability requires subjective, not objective, culpability. 511 U.S. at 843

n.8.

Importantly, the subjective inquiry that must be made in determining whether deliberate indifference exists is meant to prevent the constitutionalization of medical malpractice or negligence claims. "[T]hus, a plaintiff alleging deliberate indifference must show more than negligence or misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The Court of Appeals has explained:

> It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute "deliberate indifference." As the *Estelle* Court noted: "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105; *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) ("[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation."); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("[C]ertainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.") (emphasis omitted). "Deliberate indifference," therefore, requires "obduracy and wantonness," *Whitley v. Albers*, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm").

*Rouse*, 182 F.3d at 197 (parallel citations omitted); *see, e.g.*, *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) ("[a]llegations of medical malpractice are not sufficient to establish a Constitutional violation."). Thus, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Pearson*, 850 F.3d at 535.

Moreover, when it comes to claims of deliberate indifference, there is a "critical distinction" between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *Id.* (citation omitted).

30

> Because "mere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation," *Monmouth Cty. Corr. Inst. v. Lanzaro*, 834 F.2d 326, 346 (3d. Cir. 1987), when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights").

*Id.* That said, the fact that prison medical personnel have provided some medical care to an inmate does not preclude a finding of deliberate indifference:

> [T]here are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier and less efficacious treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). And, "knowledge of the need for medical care [may not be accompanied by the]…intentional refusal to provide that care." *Id.* (alterations in original) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 204 (11th Cir. 1985)).

*Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017). Nevertheless, the court "must examine the totality of an inmate's care when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

Two of the defendants in this civil action are CHCAs. Thus, it must be noted that courts within the Third Circuit recognize that CHCAs are "undisputably administrators, not doctors," and therefore "will generally be justified in believing that the prisoner is in capable hands" if the "prisoner is under the care of medical experts." *Thomas v. Dragovich*, 142 F. App'x 33, 39 (3d Cir. 2005); *see also Fantone v. Herbik*, 528 F. App'x 123, 128 n.6 (3d Cir. 2013). As the Court of Appeals has made clear, "a non-medical prison official" cannot "be charge[d] with the Eighth Amendment scienter requirement of deliberate indifference" when the "prisoner is under the care

of medical experts" and the official does not have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill*, 372 F.3d at 236; *see also Durmer*, 991 F.2d at 69 (holding that non-physicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor").

A.  Plaintiff's Claim Against Defendant Nicholson for Alleged Lack of Treatment From September 18, 2017 to April 10, 2018

Plaintiff claims Defendant Nicholson is liable to him for delay of medical care from September 18, 2017 through April 10, 2018 because Plaintiff "did not receive medical treatment despite two physicians' orders and instructions that he be scheduled for follow-up care on their lines, and have [physical therapy] consults entered." (ECF 121 pp. 10-12.) The "two physicians' orders" to which Plaintiff refers are those issued by Dr. Smyth on May 26, 2017 and Dr. Jayakumar on September 18, 2017. (*Id.* p. 12; ECF 117 p. 4; ECF 121-4 p. 2; ECF 121 p. 12.) Plaintiff argues that Defendant Nicholson's "complete reckless disregard for his responsibilities and D.O.C. policy, along with his deliberate and inexcusable disregard to take action on specific knowledge that Plaintiff was not receiving his ordered follow-up visits and [physical therapy]" amounted to deliberate indifference under the Eighth Amendment. (ECF 121 p. 13.)

The DOC Defendants move for summary judgment on this claim on the ground that Defendant Nicholson lacked the requisite personal involvement in any alleged delay in Plaintiff's physical therapy consultations or follow-up visits with Dr. Smyth or Dr. Jayakumar. They also contend that, even when viewing the evidence in the light most favorable to Plaintiff, Defendant Nicholson's conduct did not amount to deliberate indifference nor was Plaintiff harmed by the alleged delay. The Court finds these arguments to be persuasive.

32

First, it is undisputed Plaintiff did not notify Defendant Nicholson that he missed a physical therapy appointment scheduled by Dr. Smyth until he submitted a Request to Staff dated September 23, 2017. In this request slip, however, Plaintiff only complained that he missed a physical therapy appointment that had been scheduled following his May 26, 2017 visit with Dr. Smyth because there was "a staff mess up." (ECF 121-8 p. 11.) Plaintiff wrote that after this "staff mess up" he was seen by a medical provider, prescribed medication, and "put back on physical therapy but was charged $10.00" (*Id.*) His complaint to Defendant Nicholson was limited to the fact that he was being charged the $10.00, not that he was unable to obtain a physical therapy appointment or a follow-up visit with Dr. Smyth.

Thus, no rational factfinder could impute liability to Defendant Nicholson because Plaintiff did not receive a follow-up visit or all of his scheduled physical therapy appointments after his appointment with Dr. Smyth. The summary judgment record establishes, without contradiction, that Defendant Nicholson lacked personal involvement in the scheduling or canceling of these appointments, and was not notified about what partially had occurred until well after the fact, and then only because Plaintiff wanted a refund of the $10.00 fee.

Second, although Defendant Nicholson advised Plaintiff in response to Plaintiff's September 23, 2017 request slip that a new physical therapy consult would need to be entered and "he would make that happen[,]" (*id.*) the evidence in the summary judgment record reflects that by this point in time Plaintiff had recently been examined by Dr. Jayakumar. On September 18, 2017 Dr. Jayakumar placed an order for an X-ray (which Plaintiff had on September 20, 2017) as well as an order for him to be re-evaluated by physical therapy. (ECF 199 ¶ 7; ECF 117 p. 15.) She also prescribed him a Medrol dose pack and instructed him to place a sick call "next week or

sooner if symptoms worsen or persist." (*Id.*)

Accordingly, Plaintiff's medical records from the time frame in which he submitted his September 23, 2017 request slip to Defendant Nicholson reflected Dr. Jayakumar was treating him for his recurrent neck pain. Thus, as a matter of law Defendant Nicholson cannot be found to have been deliberately indifferent to Plaintiff's chronic neck pain at that time. *See, e.g.*, *Durmer*, 991 F.2d at 69 (affirming summary judgment in favor of two non-medical prison officials on the basis that "[n]either of these defendants…is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor."); *Spruill*, 372 F.3d at 236 ("absent a reason to believe (or actual knowledge) that prisoner doctors or their assistant are mistreating (or not treating) a prisoner, a non-medical prison official…will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.")

Plaintiff directs the Court to evidence that following his September 18, 2017 appointment with Dr. Jayakumar he had no follow-up visit with her or physical therapy. (ECF 121-6, Pl's Decl. I ¶¶ 5-6; ECF 122 ¶ 11.) To support his contention that Defendant Nicholson was aware of these matters, Plaintiff cites his sister Brodsky-Walls' declaration, in which she states she spoke to Defendant Nicholson sometime between October-December 2017 and expressed her "concern about [Plaintiff] not getting [p]hysical [t]herapy nor follow ups to get [m]edication for pain." (ECF 139-1 ¶ 3, Brodsky-Walls Decl. ¶ 3.) According to Brodsky-Walls, Defendant Nicholson advised her during this conversation that he would have Plaintiff seen and get physical therapy. (*Id.*) Notwithstanding this assurance, Plaintiff points out, he was not scheduled for physical therapy until after his April 10, 2018 appointment with Dr. Santos.

Plaintiff argues that after Defendant Nicholson's discussion with Brodsky-Walls, he was obligated to act because DOC policy provides that one of his duties is to ensure that Plaintiff received ordered follow-up sick calls and physical therapy consults within thirty days. But to prevail on an Eighth Amendment claim Plaintiff must do more than establish that Defendant Nicholson violated DOC policy. *See, e.g.*, *Jordan v. Rowley*, No. 1:16-cv-1261, 2017 WL 281329, at *2 (M.D. Pa. 2017) ("[A] violation of an internal prison policy does not automatically rise to the level of a constitutional violation. A prison policy manual does not have the force of law and does not rise to the level of a constitutional violation.") (internal quotation and citation omitted); *McGinnis v. Hammer*, No. 2:15-cv-398, 2017 WL 4286420, at *12 (W.D. Pa. July 28, 2017) ("a violation of prison policy is insufficient by itself to support an argument for deliberate indifference.") (internal quotation and citation omitted), *report and recommendation adopted by*, 2017 WL 4236063 (W.D. Pa. Sept. 25, 2017), *aff'd*, 751 F. App'x 287 (3d Cir. 2018) Thus, evidence that Defendant Nicholson may have violated DOC policy is not evidence, in and of itself, from which a reasonable jury could conclude that he violated Plaintiff's Eighth Amendment rights.

As discussed above, to prove that Defendant Nicholson violated Plaintiff's Eighth Amendment rights, Plaintiff must make a subjective showing that Defendant Nicholson was deliberately indifferent to his serious medical need. There is no direct or circumstantial evidence in the summary judgment record that supports a finding that Defendant Nicholson possessed the requisite scienter of deliberate indifference to a serious medical need during the time period at issue here. For example, Plaintiff has not directed the Court to evidence that Defendant Nicholson failed to act because he was intentionally trying to deny Plaintiff medical care. Nor is there evidence that Plaintiff actually required physical therapy or medication to treat his chronic neck

pain at this time, let alone that Defendant Nicholson should have drawn the inference that if Plaintiff did not receive them he faced an excessive risk of harm. At most, a reasonable factfinder could conclude that Defendant Nicholson was negligent when he failed to arrange a physical therapy appointment or a follow-up visit with Dr. Jayakumar after his discussion with Brodsky-Walls. As set forth above, however, under the subjective prong of the Eighth Amendment test, negligent behavior do not meet the *mens rea* requirement.

In any event, Plaintiff has not directed the Court to evidence from which a factfinder could conclude he suffered harm as a result of the delay he attributes to Defendant Nicholson. A delay in medical care can only constitute a constitutional violation if there has been deliberate indifference which results in harm. *See, e.g.*, *Brooks v. Kyler*, 204 F.3d 102, 105 n.4 (3d Cir. 2000) (summary judgment on medical treatment claim appropriate when there was no evidence that the delay in medical treatment "expose[d] the inmate 'to undue suffering or the threat of tangible residual injury.'") (quoting *Monmouth Cnty. Corr. Inst. Inmates*, 834 F.2d at 346); *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993) ("delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference with results in…harm"); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (same); *Fox v. Lawrence County Jail*, No. 06-cv-1010, 2008 WL 2704546, *10 (W.D. Pa. June 30, 2008) (defendant entitled to summary judgment due to the absence of evidence that plaintiff suffered additional harm caused by the delay in medical treatment).

Plaintiff asserts Defendant Nicholson's alleged failure to act following his discussion with Brodsky-Walls harmed him because it caused a delay in care, since he did not have an appointment with Dr. Santos until April 10, 2018, or the physical therapy ordered by Dr. Santos until

May 17, 2018. (ECF 145 p. 3.)[7] Plaintiff's argument is not convincing because he could have submitted a sick call request if he required medical care for his chronic neck pain between the time Brodsky-Walls spoke to Defendant Nicholson and his April 10, 2018 visit with Dr. Santos. Importantly, he has directed the Court to no evidence he did so, or that Defendant Nicholson interfered with any such request. Plaintiff also asserts he was harmed by the delay because it resulted in a concomitant delay in his referral to the neurosurgical consultation for treatment options. This assertion is entirely speculative, however, and is not supported by any corroborative evidence.

Based upon the foregoing, the DOC Defendants have met their burden to show that Defendant Nicholson is entitled to judgment in his favor with respect to Plaintiff's claim he was deliberately indifferent to his serious medical needs from September 18, 2017 to April 10, 2018. Accordingly, the Court will grant their motion regarding this claim.

B. <u>Plaintiff's Claim Against Defendant Tormey</u>

Plaintiff claims Defendant Tormey, who conducted four sick call visits with him between May 18, 2018 and August 1, 2018, was deliberately indifferent to his serious medical needs because she denied medical treatment for his neck pain and ear and vertigo issues. She did so, Plaintiff contends, because she attributed the pain he described as related to his anxiety and, therefore, concluded that this presented mental health, not medical, issues. (Amend. Compl. ¶¶ 30-46, 100; ECF 121 pp. 20-23.)

The Court notes that the Medical Defendants do not specifically dispute Plaintiff's

---

[7] As set forth above, following his examination of Plaintiff on April 10, 2018, Dr. Santos assessed Plaintiff with a neck strain to be treated with steroids and physical therapy. (ECF 119 ¶ 10; ECF 117 p. 184.)

averments that during each sick call visit conducted by Defendant Tormey during this time frame, he reported experiencing neck and other pain and sought medication or to be seen by Dr. Smyth. Rather, they contend that Defendant Tormey is entitled to judgment in her favor because her assessment of Plaintiff's issues and need for treatment is not actionable under the Eighth Amendment. (ECF 118 pp. 12-15.)

Viewing the facts in the light most favorable to Plaintiff, during one or more of the sick call visits with Defendant Tormey between May 18th and August 1st, Plaintiff asked her to prescribe medication for his neck pain because his prior prescriptions had expired. He also requested to be seen by Dr. Smyth. Additionally, Plaintiff discussed with Defendant Tormey his anxiety and insisted his neck pain, as well as the other symptoms he was experiencing, were not caused by his anxiety. Notwithstanding Plaintiff's own assessment of his condition, Defendant Tormey attributed Plaintiff's pain and other symptoms to his anxiety. She declined to prescribe him the pain medication he requested and specifically told him that the symptoms he described were caused by his anxiety for which he needed to see a psych provider. (ECF 121-6, Pl's Decl. I ¶ 9; ECF 130-3, Pl's Decl. II ¶¶ 1-9; ECF 130-9, Pl's Decl. III ¶¶ 1-4.)

As such, Plaintiff's Eighth Amendment claim against Defendant Tormey is predicated on his disagreement with her medical judgment after she examined him during the four sick call visits, and her decision to decline his request to prescribe medication to treat the symptoms he described to her (aside from the medication for his clogged ears) or refer him to another provider. It is well-established that "mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *see, e.g.*, *Gause v. Diguglielmo*, 339 F. App'x 132, 135 (3d Cir. 2009) (disagreements between the prisoner and the treating

physician over medical treatment do not rise to the level of "deliberate indifference.") (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 473 (3d Cir. 1987)).

If, as Plaintiff asserts, Defendant Tormey was incorrect in her assessment of him, the evidence, even when viewed in the light most favorable to him, supports at most a claim of negligence or malpractice, not an Eighth Amendment violation. As set forth above, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Pearson*, 850 F.3d at 535. "[I]t is well-settled that misdiagnosis is not deliberate indifference, but rather amounts to medical malpractice, which is not actional under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

Although Plaintiff argues that Defendant Tormey's assessment of him was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition, *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005), even under his version of events, the most that can be said of his claim against her is she exercised deficient professional judgment during her examinations. That does not create a triable issue of fact sufficient to preclude summary judgment in Defendant Tormey's favor. *See, e.g.*, *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("While the distinction between deliberate indifference and malpractice can be subtle, it is well established that so long as a physician exercises professional judgment, his behavior will not violate the prisoner's constitutional rights.").

Based upon the foregoing, Defendant Tormey is entitled to judgment in her favor on Plaintiff's Eighth Amendment claim against her. Accordingly, the Court will grant the Medical Defendants' summary judgment motion on this claim.

C. Plaintiff's Claim against the DOC Defendants for failing to adequate address his complaints about Defendant Tormey's Treatment

Plaintiff claims that both Defendant Nicholson and Wood were deliberately indifferent to his serious medical needs because they had specific knowledge that Defendant Tormey  mistreated him and he was still not getting proper care. (Amend. Compl. ¶¶ 40-47, 98-99, 104-05; ECF 121 pp. 16-19; ECF 131 ¶¶ 39-43.) In support of this claim, Plaintiff relies upon evidence that Brodsky-Walls spoke with Defendant Wood about the alleged mistreatment in August 2018 (ECF 139-1, Brodsky-Wall's Decl. ¶ 5). Moreover, around this same time Plaintiff filed Grievance 750459, which was assigned to, and denied by, Defendant Nicholson. (ECF 116-2 pp. 15-16.)

The Court concludes the DOC Defendants have met their burden of demonstrating they are entitled to summary judgment on this claim. For the reasons previously discussed, Defendant Tormey is entitled to judgment in her favor on Plaintiff's claim of deliberate indifference. It follows, then, that Plaintiff cannot establish Eighth Amendment liability on the part of the DOC Defendants. *See, e.g.*, *McGinnis*, No. 2:15-cv-398, 2017 WL 4286420, at *11 (administrator could not be found to be deliberately indifferent to plaintiff's serious medical need when the conduct of the medical staff who treated the plaintiff did not fall below Eighth Amendment standards.)

Alternatively, even if Plaintiff had identified any triable issue of fact as to whether Defendant Tormey's conduct amount to deliberate indifference, Plaintiff's claims against the DOC Defendants still fail as a matter of law. He contends that they should have disregarded Defendant Tormey's assessment of him, notified her supervisors, and arranged for him to be seen by Dr. Smyth. But as previously explained, neither Defendant Nicholson nor Defendant Wood can be liable for failing to second-guess Defendant Tormey's medical judgment or failing to dictate an alternative course of treatment. *See, e.g.*, *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 236; *Thomas*,

142 F. App'x at 39. Plaintiff's evidence simply does not satisfy the subjective component of the deliberate indifference test that the DOC Defendants acted with a "'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834.

The Court further notes that during May-August 2018 time period that Defendant Tormey conducted the relevant sick call visits with Plaintiff, he also was receiving treatment for his chronic neck pain during his physical therapy sessions with Kushner, with whom Plaintiff had appointments on May 17, 2018, June 16, 2018 and July 19, 2018. He also was examined by RN Grabowski on June 11, 2018 and seen by psychiatry on August 16, 2018. For these reasons as well, there is no material issue of fact regarding whether the DOC Defendants had reason to believe, or actual knowledge, that Plaintiff was being mistreated or not receiving constitutionally adequate treatment during this time period.

Based upon the foregoing, the DOC Defendants are entitled to summary judgment with respect to Plaintiff's claims that they were deliberately indifferent to his complaints and those of his sister about Defendant Tormey's treatment and assessment. Therefore, the Court will grant their motion as it pertains to these claims.

D. Plaintiff's Claims Against the DOC Defendants for Delaying Medical Treatment After He Reaggravated His Neck on August 28, 2018 and January 3, 2019

Plaintiff asserts that on August 28, 2018 and again on January 3, 2019, he strained his neck while moving his property and, on each occasion, reaggravated his chronic neck problems to such an extent that he experienced severe pain and had difficulty moving. He claims that Defendant Wood was deliberately indifferent to his serious medical needs because she did not arrange for him to receive immediate medical treatment after the August 28, 2018 incident, and that Defendant Nicholson is liable to him because he similarly failed to ensure Plaintiff receive emergency medical

care after the January 3, 2019 incident.

Under Plaintiff's version of events, after the August 28, 2018 incident, Brodsky-Walls called Defendant Wood on September 4 and September 5, 2018 and informed her that the prison lockdown was interfering with Plaintiff's ability to be seen by medical and that he required medical attention right away. (ECF 139-1, Brodsky-Walls' Decl. ¶¶ 10-11.) Although Defendant Wood told Brodsky-Walls during each phone call that she would see to it that Plaintiff received medical care, that did not occur. Instead, Plaintiff did not receive medical treatment for his neck pain until September 7, 2018, and only after he "begged [a sergeant] to make medical see [him] for all of my pain[.]" (ECF 130-3, Pl's Decl. II ¶ 18.)

On September 7, 2018, a nurse gave Plaintiff "ice and Motrin" and he was evaluated by Dr. Daniel the next morning. (*Id.* ¶¶ 17-18.) Dr. Daniel noted that Plaintiff was not in acute distress and his neck and left arm were observed with full range of motion. Her assessment included neck sprain/strain, and Plaintiff was provided injections of Toradol and Kenalog. (ECF 119 ¶¶ 20-21; ECF 117 pp. 160-63.)

Regarding the January 3, 2019 incident, Brodsky-Walls avers she called Defendant Nicholson on that date as well as the following day and informed him that Plaintiff required emergency medical care because his neck was hurting so badly he could not move. (ECF 139-1, Brodsky-Walls' Decl. ¶¶ 12-13.) Defendant Nicholson advised Brodsky-Walls that, based upon his investigation, he had determined that Plaintiff was lying about the extent of his injury and did not require emergency care. (*Id.*) Plaintiff eventually received medical treatment for his pain, but it was not until January 10, 2019.

During his January 10, 2019 sick call visit with Defendant Tormey, Plaintiff "describe[d]

tweaking his neck and a pinching sensation but 'nowhere near as bad as the original injury' but was still not going away." (ECF 117 p. 123.) Defendant Tormey noted Plaintiff had a normal gait and he "was observed on the walkway to be talking to other staff and inmates and turned his head to speak to them. Then was observed looking down at the ground with his neck in flexion and then straightened it without difficulty. While describing his issues he gestures freely and points to various areas of pain shooting down his arm or 'numbness'[.]" (*Id.*) Defendant Tormey assessed Plaintiff as having a neck sprain/strain, and determine the treatment plan was to provide injections of Methylpred and Ketorolac once daily over the next two days. (*Id.*)

The DOC Defendants contend that, even under Plaintiff's version of the facts, they are entitled to summary judgment because the brief delays in treatment on which his claims are premised are not actionable under the Eighth Amendment. The Court agrees.

It is not disputed that from May 26, 2017 until his transfer from SCI Greene in November 2019, Plaintiff suffered from chronic neck pain that his medical care providers managed with medication and physical therapy treatment as they deemed appropriate. They also scheduled occasional X-ray, MRI or EMG testing and appointments with outside consults. If, in fact, as Plaintiff contends, he was delayed medical treatment for the severe neck pain he experienced as a result of moving property on August 28, 2018 and again on January 3, 2019, the conduct of Defendant Wood and Defendant Nicholson in these isolated circumstances may amount to negligence, but it does not represent an Eighth Amendment violation. *See, e.g.*, *Gutierrez*, 111 F.3d at 1374-75 (concluding "at most [plaintiff] experienced an isolated occasion or two where he did not receive prompt treatment" and that "occasional delays[,]" which did not reveal a "pattern of conduct," "were simply isolated instances of neglect, which taken alone or collectively cannot

support a finding of deliberate indifference.")

Additionally, as the DOC Defendants point out, to defeat summary judgment in their favor Plaintiff must direct the Court to evidence that there is a genuine issue of material fact as to whether he was harmed by the failure of either Defendant Wood or Defendant Nicholson to ensure he was immediately seen by the medical department during the incidents in question. This requires the production of evidence from which a reasonable factfinder could find the temporary denial of medical care exposed him "'to undue suffering or the threat of tangible residual injury.'" *Brooks*, 204 F.3d at 105 n.4 (quoting *Monmouth Cnty. Corr. Inst. Inmates*, 834 F.2d at 346.)

Here, under Plaintiff's version of the facts, Brodsky-Walls first alerted Defendant Wood on September 4, 2018 that he required medical treatment for his neck due to the August 28, 2018 incident. He began receiving medical treatment for that injury on September 7, 2018. Under the circumstances, Plaintiff has not adduced evidence that this brief three-day delay in treatment after Wood was notified resulted in actionable harm. His medical records reflect that when Dr. Daniel examined him on September 8, 2018, he was not in acute distress and his neck and left arm had full range of motion.

As for the January 3, 2019 incident, Brodsky-Walls states in her declaration that Defendant Nicholson told her he thought Plaintiff was lying about the severity of his injury because he called Plaintiff's unit and a correctional officer advised him that Plaintiff was "walking around fine." (ECF 139-1, Brodsky-Walls' Decl. ¶ 12.) Brodsky-Walls' description of these events undermines Plaintiff's claim that Defendant Nicholson acted with deliberate indifference, since it is evidence of his subjective belief that Plaintiff did not require emergency treatment. *Farmer*, 511 U.S. at 837 (the state of mind of deliberate indifference requires a showing that "the official knowns of and

44

disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he also must draw that inference*.") (emphasis added.)

Moreover, Plaintiff has not produced or identified any evidence that creates a triable issue of fact as to whether he was harmed by the seven-day delay in receiving treatment following the January 3, 2019 incident. Notably absent from his declarations are averments that the severe neck pain he experienced on January 3rd and perhaps into January 4th continued unabated until his January 10, 2019 examination with Defendant Tormey. (*See* ECF 121-6, Pl's Decl. I ¶¶ 14-17; ECF 130-3, Pl's Decl. II ¶¶ 22-23.) As set forth above, in her progress notes for Plaintiff's January 10, 2019 sick call visit, Defendant Tormey recorded that although Plaintiff informed her that on January 3, 2019 he had tweaked his neck and still felt a "pinching sensation," he also said his current symptoms were "nowhere near as bad as the original injury[.]" (ECF 117 p. 123.) She also noted Plaintiff was walking normally and able to turn his head without noticeable difficulty. (*Id.*)

In conclusion, viewing the evidence in a light most favorable to Plaintiff, it establishes, at most, that in response to the two incidents at issue Defendant Wood and Defendant Nicholson were negligent but not deliberately indifferent to a serious medical need. Moreover, Plaintiff has failed to adduce any evidence that the brief delays in treatment he experienced, or the temporary denial of care, caused him undue suffering or the threat of tangible residual injury necessary to establish an Eighth Amendment violation. There are no genuine issues of material fact related to the delayed medical care claims he brings against the DOC Defendants related to the August 28, 2018 and January 3, 2019 incidents. Thus, summary judgment will be granted in their

45

favor on these claims as well.

E.   <u>Plaintiff's Claims Against Defendant Hammer</u>

Plaintiff claims that Defendant Hammer (a) violated his Eighth Amendment rights for discontinuing Prozac and Neurontin and instead prescribing Cymbalta following a sick call visit he conducted on September 17, 2019 at Plaintiff's cell door, causing Plaintiff to experience severe withdrawal symptoms; (b) violated his Eighth and Fourteenth Amendment rights for not providing Plaintiff with information to make an informed decision as to the medication change to Cymbalta on September 17, 2019; and (c) violated his Fourteenth Amendment right to privacy by conducting sick call visits in September 2019 at Plaintiff's cell door within hearing distance of other individuals. (*Id.* ¶¶ 72, 103.)

The Medical Defendants contend Defendant Hammer is entitled to summary judgment with respect to each of these claims because Plaintiff did not exhaust his administrative remedies prior to bringing his lawsuit against Defendant Hammer, as required by the Prison Litigation Reform Act ("PLRA"). The PLRA provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)).

Importantly, the PLRA's mandatory exhaustion requirement means the prisoner *must*

*complete* the administrative review process in accordance with the procedural rules of the grievance or appeal system at his facility prior to bringing his lawsuit against a defendant. "A prisoner may not satisfy the PLRA's exhaustion requirement by exhausting administrative remedies *after* initiating suit in federal court." *Washington v. Gilmore*, 852 F. App'x 639, 641 (3d Cir. 2021) (citing *Johnson v. Jones*, 340 F.3d 624, 627-28 (8th Cir. 2003) ("If exhaustion was not completed at the time of filing, dismissal is mandatory.") and *Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002) ("Whatever the parameters of 'substantial compliance' [with a prison's grievance procedures], it does not encompass...the filing of a suit before administrative exhaustion, however late, has been completed.").

The prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 230-31. The DOC's Inmate Grievance System applicable to this case is set forth in DC-ADM 804. It sets forth a three-tier administrative remedy protocol. A prisoner is required to present his grievance to the Facility Grievance Coordinator for initial review. The prisoner is required to appeal an adverse determination by the Facility Grievance Coordinator to the Facility Manager. From there the prisoner must appeal to SOIGA for final review.

Here, Plaintiff brought his claims against Defendant Hammer on or around October 29, 2019, when he submitted his original complaint to prison authorities for mailing. (*See* ECF 7 p  18); *Washington*, 852 F. App'x at 641. As previously observed, although Plaintiff alleged in the original complaint he had fully exhausted all claims against all defendants (*id.* ¶¶ 5, 77), that allegation was not accurate as it pertained to the claims brought against Defendant Hammer. Plaintiff did not exhaust his claims against Defendant Hammer until December 20, 2019, the date

on which SOIGA issued its final appeal decision upholding the lower denials of Grievance 8258833. (ECF 119 ¶ 76; ECF 117-1 p. 202-03.)

Therefore, Plaintiff brought this action against Defendant Hammer before exhausting his administrative remedies on the claims he asserts against him. As such, Defendant Hammer argues, he is entitled to summary judgment in his favor.

To avoid this result, Plaintiff counters that his failure to abide by the PLRA is harmless error and did not prejudice Defendant Hammer. (ECF 129 p. 9.) There is no "harmless error" consideration under the PLRA's mandatory exhaustion requirements, however. The PLRA exhaustion requirements are mandatory and courts are not given discretion to decide whether exhaustion should be excused. *Ross*, 136 S. Ct. at 1858.

Plaintiff also suggests the filing of his amended complaints, which he filed after he completed exhaustion of his claims against Defendant Hammer, cured his premature lawsuit against him.[8] In *Garrett v. Wexford Health*, 938 F. 3d 69, 88 (3d Cir. 2019), the Court of Appeals held that an amended or a supplemental complaint *filed post-incarceration* cures a former inmate's failure to exhaust administrative remedies while imprisoned so long as the amended or supplemental complaint relates back to the initial complaint. *Garrett* is distinguishable from this case, however, because there was no change in Plaintiff's custody status between the time he filed his original complaint and the time he filed his operative amended complaint. Thus, when Plaintiff

---

[8] The Court also notes that there was no basis to construe Plaintiff's Second Amended Complaint as a supplemental complaint under Rule 15(d). Plaintiff indicated in his original complaint that he had fully exhausted all his claims. His amended complaints did not reflect they were filed to cure his initial defect of failing to complete exhaustion before bringing his action against Defendant Hammer. Moreover, the claims against Defendant Hammer in the Second Amended Complaint are the same as those that were asserted in the original complaint.

filed his operative amended complaint he was still subject to the PLRA's mandatory exhaustion requirement.

In any event, setting aside the matter of exhaustion, the Medical Defendants alternatively argue that there is no genuine dispute as to any material fact relevant to the substance of the claims Plaintiff brings against Defendant Hammer. Therefore, they contend, he is entitled to judgment as a matter of law for this reason as well.

Plaintiff claims that Defendant Hammer violated his Eighth Amendment rights because he disagreed with Defendant Hammer's decision to discontinue Prozac and Neurtontin and prescribe Cymbalta following the September 17, 2019 sick call visit. As previously explained, this type of mere disagreement over medical judgment does not support an Eighth Amendment claim of deliberate indifference. *See*, *e.g.*, *White*, 897 F.2d at 110; *Gause*, 339 F. App'x at 135. It is also worth noting that as the undisputed evidence shows, Defendant Hammer discussed Plaintiff's medication changes with Dr. Pillai and Connie Wetten, and the order to discontinue the Prozac was submitted by Dr. Pillai and the order to discontinue Neurontin was submitted by Dr. Daniel. (ECF 119 ¶ 54; ECF 117 pp. 65-66, 300-31.)

As for Plaintiff's "informed consent claim," under the circumstances of this case it is duplicative of his Eighth Amendment deliberate indifference claim regarding Defendant Hammer's decision to prescribe Plaintiff Cymbalta instead of Neurontin. Thus, under the "explicit source" rule, the Eighth Amendment claim subsumes Plaintiff's Fourteenth Amendment claim. *See*, *e.g.*, *Sadelmyer v. Peltzer*, No. 2:12-cv-1785, 2013 WL 4766517, *6 (W.D. Pa. Sept. 4, 2013) (because the Eighth Amendment provided an explicit source of protection, plaintiff's claim was preempted by the Eighth Amendment and should not be analyzed as a substantive due process

claim under the Fourteenth Amendment).

Finally, there are no material issues of fact that preclude summary judgment on Plaintiff's claim that Defendant Hammer violated his right to privacy. In fact, Plaintiff does not appear to dispute the Medical Defendants' contention Defendant Hammer is entitled to summary judgment on this claim. Nevertheless, the Court will address it.

In *Doe v. Delie*, 257 F.3d 309, 315-18 (3d Cir. 2001), an inmate challenged certain prison procedures that resulted in the repeated disclosure of his HIV-positive status. The Court of Appeals recognized that the Fourteenth Amendment affords a prisoner the right to privacy in his medical information. It also held that "a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen[,]" and that his "constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." *Id.* at 317. Thus, the Court of Appeals held, a prisoner's right to privacy in his medical information "may be curtailed by" a policy that is "reasonably related to a legitimate penological interests." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Plaintiff has not directed the Court to any evidence that any concerns he may have had about his privacy at the cell door were conveyed to Defendant Hammer so that Defendant Hammer could have conducted the visits on September 17th and September 19th differently. Moreover, these visits were not occasions when particularly sensitive medical information was being discussed; instead, these visits were conducted to address a change in pain medication. Even though the change in medication may have impacted a psychiatric medication, Plaintiff had medical and psychiatric visits while in the RHU before and after this period and there is no

evidence that he raised any concerns regarding his privacy during any of these visits. The Court further notes that Plaintiff has produced no evidence that any inmate or staff member overheard his discussions with Defendant Hammer during the sick call visits at issue. For these reasons, there is no material issue of fact precluding summary judgment in Defendant Hammer's favor on Plaintiff's right-to-privacy violation claim.

In conclusion, the Medical Defendants have demonstrated Defendant Hammer is entitled to judgment in his favor because Plaintiff failed to exhaust his administrative remedies prior to bringing suit against him. Alternatively, even if Plaintiff's amended complaint cured his initial failure to exhaust, the Medical Defendants have also met their burden of demonstrating that there are no genuine issues of material fact with respect to Plaintiff's claim that Defendant Hammer violated either his Eighth or Fourteenth Amendment rights. Therefore, he is entitled to summary judgment on all of Plaintiff's claims against him.

## V.      Conclusion

For the reasons set forth herein, the Court will grant the Medical Defendants' Motion for Summary Judgment (ECF 110) and the DOC Defendants' Motion for Summary Judgment (ECF 113) and will deny Plaintiff's Partial Motion for Summary Judgment (ECF 120).

An appropriate order will follow.

BY THE COURT:


Dated: September 28, 2021                    /s/ Patricia L. Dodge
                                             PATRICIA L. DODGE
                                             United States Magistrate Judge